**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **STACEY BURDEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:06CV705 JCH(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying Stacey Burden's application for a Period of Disability and Disability Insurance Benefits

under Title II of the Social Security Act and Supplemental Security Income under Title XVI of

the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report

and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the

Complaint. (Document Number 20). Defendant has filed a Brief in Support of the Answer.

(Doc. No. 21).

**Procedural History**

On February 21, 2003, plaintiff filed her application for benefits, claiming that she became

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time
Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue
became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action.
See Fed.R.Civ.P. 25(d)(1).

unable to work due to her disabling condition on December 31, 2002. (Tr. 76-78). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated April 6, 2005. (Tr. 60-63, 13-22). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on March 2, 2006. (Tr. 11, 7-10). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.     ALJ Hearing

Plaintiff's administrative hearing was held on November 3, 2004. (Tr. 25). Plaintiff was present and was represented by counsel. (Id.).

The ALJ then examined plaintiff, who testified that she was 37 years of age, lived with her mother, and was single. (Id.). Plaintiff stated that she was not working at the time of the hearing. (Id.). Plaintiff testified that she last worked in December of 2001, at McDonald's restaurant. (Tr. 26). Plaintiff stated that she quit school during the tenth grade. (Id.).

Plaintiff testified that she has not been working because she fell and injured her right knee at work. (Id.). Plaintiff stated that she was in the freezer bringing out products when she tripped over a piece of wood and fell. (Id.). Plaintiff testified that she underwent an MRI in March of 2002, which did not reveal any abnormalities in her knee. (Id.). Plaintiff stated that she has not undergone surgery on her knee. (Id.). Plaintiff testified that she has not received any treatment for her knee in the six months prior to the hearing. (Id.).

Plaintiff testified that Kenneth Smith is her primary physician. (Tr. 27). Plaintiff stated

that she sees Dr. Smith for her knee, thyroid problems, stomach problems, ulcers, hernia, high blood pressure, sleep apnea,[2] and obesity.  (Id.).  Plaintiff testified that she does not smoke.  (Id.).  Plaintiff testified that her worst impairment is her obesity.  (Id.).  Plaintiff stated that her obesity keeps her from standing for long periods of time.  (Id.).

Plaintiff testified that her sleep apnea is also a major problem, and that it prevents her from staying awake during the day.  (Id.).  Plaintiff stated that she uses a CPAP[3] machine, which helps her sleep at night, but she is still fatigued during the day.  (Id.).  Plaintiff testified that she takes frequent naps during the day.  (Tr. 28).

Plaintiff testified that she does not have health insurance.  (Id.).

Plaintiff stated that on a typical day, she is not active.  (Id.).  Plaintiff testified that she does a little housework.  (Id.).  Plaintiff stated that she does not do any volunteer work.  (Id.).  Plaintiff testified that she has not applied for any jobs, and she has not attempted to finish her education.  (Id.).

Plaintiff's attorney then requested that several medical records be admitted into the record.  (Id.).  The ALJ indicated that he would not admit any records dated prior to plaintiff's alleged onset of disability because they were irrelevant to plaintiff's claim.  (Id.).  Plaintiff's attorney argued that the earlier records were relevant to show the longitudinal history of plaintiff's complaints of muscle pain, hypertension,[4] and obesity.  (Tr. 30).  Plaintiff's attorney made an offer

---

[2]A disorder characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway, with resultant hypoxemia and chronic lethargy.  See Stedman's Medical Dictionary, 111 (27th Ed. 2000).

[3]Abbreviation for continuous positive airway pressure.  Stedman's at 421.

[4]High blood pressure.  Stedman's at 855.

of proof as to submitting the records prior to the alleged onset date, and the ALJ denied plaintiff's attorney's request to admit the records. (Tr. 30-35).

Plaintiff's attorney then examined plaintiff, who testified that her last job was at McDonald's. (Tr. 35). Plaintiff stated that she was released to work in July of 2002, after being treated for her knee injury. (Id.). Plaintiff testified that she worked for only one day and was fired. (Id.). Plaintiff stated that she has not worked anywhere else since being fired. (Id.).

Plaintiff testified that her weight at the time of the hearing was 478 pounds. (Tr. 36). Plaintiff stated that she had gained about 30 pounds since she last worked in September of 2001. (Id.). Plaintiff testified that she was weighed at Barnes Hospital when she underwent gall bladder surgery. (Id.).

Plaintiff testified that she has been diagnosed with sleep apnea and that she uses a CPAP machine. (Id.). Plaintiff stated that she was first prescribed the CPAP machine in 1999 by a pulmonary specialist. (Id.). Plaintiff testified that she uses the CPAP machine every night, except when she has a cold. (Tr. 37). Plaintiff stated that she still wakes up during the night due to breathing problems when she uses the CPAP machine. (Id.). Plaintiff testified that when she wakes up due to breathing problems, she turns off the machine, sits up for an hour or two, and then turns the machine back on. (Id.). Plaintiff stated that she also has difficulty staying awake during the day even with the CPAP machine. (Tr. 38). Plaintiff testified that she takes regular naps during the day. (Id.). Plaintiff stated that she feels constant fatigue due to the sleep apnea. (Id.).

Plaintiff testified that she has difficulty walking and that she can only walk about half of a block. (Id.). Plaintiff stated that she experiences shortness of breath and pain in both legs after

she walks half of a block. (Id.). Plaintiff testified that she has constant pain in her right leg and her right knee, for which she takes pain medication. (Tr. 39). Plaintiff stated that she takes two pills every four hours daily. (Id.). Plaintiff testified that the pain in her right knee is constant but it increases when she stands. (Id.). Plaintiff stated that she applies heating pads and ice packs to her knee when her leg is propped. (Id.).

Plaintiff testified that she also has pain in her left lower leg, for which she has been seeing a pain management doctor, Dr. James Gibbons. (Tr. 40). Plaintiff stated that she saw Dr. Gibbons in August of 2004, at which time he recommended that she see a neurologist. (Id.).

Plaintiff testified that she saw a neurologist in April 2004 for migraines. (Id.). The ALJ indicated that he would leave the record open so that these records could be provided. (Id.). Plaintiff testified that she has experienced migraine headaches for four to five years. (Tr. 41). Plaintiff stated that the headaches are severe and they cause sensitivity to light and nausea. (Id.). Plaintiff testified that the migraines usually last two to three hours, although they occasionally last all day. (Id.). Plaintiff stated that she experiences migraines two to three times a month. (Id.). Plaintiff testified that her neurologist prescribed medication for her migraines, which she takes daily. (Tr. 42). Plaintiff stated that she also takes Topamax[5] at the onset of a migraine. (Id.). Plaintiff testified that the Topamax causes drowsiness, so she takes this medication before bed. (Id.).

Plaintiff stated that she also takes medication for her thyroid and for high blood pressure. (Tr. 43). Plaintiff testified that her blood pressure increases when she experiences stress. (Id.).

_____

[5]Topamax is an anti-epileptic drug indicated for the relief of seizures. See PDR at 2501-03.

Plaintiff stated that she takes medication for her stomach ulcers and her hiatal hernia.[6] (Id.). Plaintiff testified that she also takes medication for depression, which was prescribed by Dr. Kenneth Smith. (Id.). Plaintiff stated that her depression causes her to feel "down" once or twice a week. (Tr. 44). Plaintiff testified that she has not received any counseling or other treatment for her depression. (Id.). Plaintiff stated that when she is depressed, she does not want to be around people and she stays in her bedroom. (Id.). Plaintiff testified that the Lexapro[7] she takes also causes drowsiness. (Id.).

Plaintiff testified that her fingers occasionally become numb. (Id.). Plaintiff stated that this has been occurring for about five months. (Id.). Plaintiff testified that she experiences pain in the wrists of both hands, which shoots into her pinky finger. (Id.). Plaintiff stated that she is right hand dominant. (Id.).

Plaintiff testified that she can stand for thirty minutes before she has to change positions due to pain. (Tr. 45). Plaintiff stated that she then has to sit down for one to two hours before standing for another thirty minutes. (Id.). Plaintiff testified that she experiences pain in both knees after standing for thirty minutes. (Id.). Plaintiff stated that she spends most of the day sitting with her legs propped. (Id.). Plaintiff testified that when she sits with her legs down, her feet swell and become numb, and her knee hurts. (Id.).

Plaintiff testified that she experiences lower back pain three to four times a month. (Tr. 46).

---

[6]Hernia of a part of the stomach through the esophageal hiatus of the diaphragm. Stedman's at 812.

[7]Lexapro is indicated for the treatment of major depressive disorder. See Physician's Desk Reference (PDR), 3532 (57th Ed. 2003).

Plaintiff stated that she completed the ninth grade and started tenth grade but did not finish the tenth grade. (Id.). Plaintiff testified that she did not do well in school, although she was not in a special education program. (Id.). Plaintiff stated that she can read and write, although she is not good at math. (Tr. 47). Plaintiff testified that she is not able to manage her own bank account, and that her mother does this for her. (Id.).

Plaintiff testified that she does not attend church. (Id.). Plaintiff stated that she belongs to the Eagles Club, which is a group that meets twice a month for about an hour. (Id.). Plaintiff testified that she also calls Bingo twice a month, which lasts for three hours. (Tr. 48). Plaintiff stated that she is able to call Bingo because she can sit with her legs propped. (Id.). Plaintiff testified that there have been times when she was unable to call Bingo because she did not feel well. (Id.).

Plaintiff testified that she has experienced chest pain, which her doctors indicated was a symptom of anxiety. (Id.). Plaintiff stated that she is under a lot of stress, and that she worries about everything. (Tr. 49).

Plaintiff testified that she helps with the housekeeping. (Id.). Plaintiff stated that she vacuums, although she has to stop periodically and take breaks. (Id.). Plaintiff testified that she lives in a five-room trailer with her mother. (Id.). Plaintiff stated that she has a washer and dryer and that she helps with the laundry. (Id.). Plaintiff testified that she can only do half loads because she is unable to lift a full basket of clothes due to back pain. (Id.). Plaintiff stated that she is also unable to bend due to her knee problems. (Tr. 50). Plaintiff testified that she cannot reach over her head or squat. (Id.). Plaintiff stated that she experiences significant pain in her knees when she climbs stairs. (Id.).

Plaintiff testified that she is currently under the treatment of Dr. Smith for her various impairments. (Id.). Plaintiff stated that she is also scheduled to undergo surgery on November 30, 2004, to have her left ovary removed due to an ovarian cyst. (Id.). Plaintiff testified that she has been experiencing severe abdominal pain for the past month due to the ovarian cyst. (Tr. 51). Plaintiff stated that her surgeon will attempt to perform laparoscopic surgery, although they may be unable to remove the cyst laparoscopically due to her obesity. (Id.).

Plaintiff testified that Dr. Smith prescribed a brace for her right knee. (Id.). Plaintiff stated that the knee brace is painful to wear because it does not fit properly. (Id.). Plaintiff testified that she tries to wear the knee brace despite the pain. (Tr. 52). Plaintiff stated that she wears the knee brace when she calls bingo because she has to sit for three hours. (Id.).

Plaintiff testified that she can lift a gallon of milk or a small package of soda. (Id.). Plaintiff stated that she shops for groceries. (Id.). Plaintiff testified that she rides in an electric cart because she is unable to walk due to pain. (Id.). Plaintiff stated that she leaves the house to go to the Eagles Club twice a month and to go to doctor appointments. (Id.). Plaintiff testified that she occasionally goes to her brother's house to visit, which is about a half-block from her house. (Tr. 53). Plaintiff stated that she does not drive and that she does not have a driver's license. (Id.). Plaintiff testified that she never attempted to get a driver's license because she does not feel comfortable driving. (Id.). Plaintiff stated that her mother took her to work. (Id.).

Plaintiff testified that she worked as a cook at a truck stop. (Id.). Plaintiff stated that she did "grill cooking" at this position. (Id.). Plaintiff testified that she was required to stand most of the time at this job and that she had to do some lifting. (Id.). Plaintiff stated that she also had to do cleaning at this position. (Tr. 54). Plaintiff testified that she worked at the truck stop off and

on from 1983 to 1996. (Id.).

Plaintiff testified that she worked at Wal-Mart from 1996 to 2000 as a stocker. (Id.). Plaintiff stated that this position involved lifting boxes that weighed ten to fifteen pounds. (Id.). Plaintiff testified that the job also required a lot of standing and walking. (Id.). Plaintiff stated that she was on her feet constantly, except during her hour lunch break and two fifteen-minute breaks. (Id.).

Plaintiff testified that she next worked at McDonald's as a grill cook. (Id.). Plaintiff stated that this was a standing job and that she had to lift items out of the freezer. (Id.). Plaintiff testified that she had to lift multiple twenty-pound boxes. (Tr. 55).

Plaintiff testified that she has never been married and she does not have any children. (Id.). Plaintiff stated that she is unable to work due to her obesity. (Id.). Plaintiff testified that she has tried many diet and exercise programs in attempts to lose weight. (Tr. 56). Plaintiff stated that she used to ride an exercise bike but she is unable to use it now due to the pain in her knees and legs. (Id.). Plaintiff testified that she believes her thyroid condition prevents her from losing weight. (Id.). Plaintiff stated that she has considered gastric bypass surgery[8] but she is unable to find a doctor who will accept Medicaid. (Id.).

Plaintiff testified that she experiences some difficulty while lying down due to her knee impairment. (Id.). Plaintiff stated that she has a hard time getting up sometimes. (Id.).

---

[8]High division of the stomach, union of the small upper pouch of the stomach to the small intestine, and closure of the distal part of the stomach that is retained; used for treatment of severe obesity. Stedman's at 264.

**B.    Relevant Medical Records**

The record reveals that plaintiff saw Dr. Kenneth Smith for various complaints, including right lower quadrant pain, low back pain, obesity, elevated blood pressure, migraines, left knee pain, dizzy spells, abdominal pain, and diarrhea, from January of 2000 through May of 2002.[9] (Tr. 111-129).

Plaintiff underwent an x-ray of her right knee on December 27, 2001, which revealed mild osteoarthritis.[10]   (Tr. 114).

Plaintiff saw Daniel J. Schwarze, M.D. of St. Louis Orthopedic Surgeons, Inc., for an evaluation of her knee in connection with a workers' compensation claim on March 11, 2002. (Tr. 150-51).  Plaintiff reported that on December 11, 2001, she was carrying a box weighing about twenty pounds at McDonald's when she slipped, twisted her knee, and fell into a stack of boxes.  (Tr. 150).  Plaintiff was started on physical therapy, which she indicated helped.  (Id.). Plaintiff reported pain over the front of the right knee radiating into the back of the knee.  (Id.). Dr. Schwarze noted that x-rays taken of plaintiff's knee were negative for acute fracture or dislocation, although mild to moderate osteoarthritis was found predominantly of the medial compartment of the knee.  (Tr. 151).  After a physical examination, Dr. Schwarze found that plaintiff's signs and symptoms were compatible with a right knee strain with exacerbation of her

_____

[9]The ALJ did not admit or consider these records because they preceded plaintiff's alleged onset date of December 31, 2002.

[10]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions; pain and loss of function result.  Stedman's at 1282.

- 10 -

underlying osteoarthritis, as well as a possible torn medial meniscus[11] or ligament strain as a result of the work-related injury. (Id.). Dr. Schwarze recommended further diagnostic work-up, including an MRI, and advised plaintiff to remain off work. (Id.).

Plaintiff underwent an MRI of the right knee on March 14, 2002, which revealed mild degenerative changes of the medial joint compartment, no internal derangement, and joint effusion. (Tr. 152).

Plaintiff saw Dr. Schwarze for re-evaluation of her right knee on March 19, 2002. (Tr. 146-47). Dr. Schwarze noted that the examination of her right knee revealed morbid obesity,[12] and that her range of motion was limited. (Tr. 146). Dr. Schwarze indicated that he discussed treatment options with plaintiff and recommended a steroid injection. (Id.). He administered the injection. (Id.). Plaintiff reported eighty percent relief of her symptoms after the injection. (Id.). Dr. Schwarze's impression was right knee strain with exacerbation of her underlying osteoarthritis. (Id.). He recommended conservative non-operative management, including physical therapy, and prescribed a knee brace. (Tr. 147). Dr. Schwarze stated that plaintiff should be able to return to work in a light duty work capacity, with a lift, push, or pull of less than ten pounds restriction, by April 1, 2002. (Id.).

Plaintiff saw Dr. Schwarze for re-evaluation of her knee on May 6, 2002. (Tr. 142-43). Plaintiff reported that she had been terminated from employment and that she had not obtained her knee brace because the supplier had no knowledge of the prescription. (Tr. 142). Dr.

---

[11]Crescent-shaped intraarticular cartilage of the knee joint. See Stedman's at 1092.

[12]Obesity sufficient to prevent normal activity or physiologic function or to cause the onset of a pathologic condition. Stedman's at 1249.

Schwarze's impression was knee strain with underlying arthritis. (Id.). He recommended that plaintiff obtain the brace and start a home exercise program. (Id.). Dr. Schwarze prescribed Darvocet[13] and released plaintiff to regular duty. (Tr. 143).

Plaintiff saw Dr. Schwarze on May 28, 2002, at which time plaintiff complained of pain and swelling in her knee. (Tr. 140). Dr. Schwarze noted that they were having trouble fitting plaintiff with the knee brace due to the size of her lower extremity. (Id.). Dr. Schwartze stated that plaintiff was not doing her home exercise program. (Id.). Upon physical examination, Dr. Schwarze found no swelling and limited range of motion due to plaintiff's adipose[14] tissue. (Id.). Dr. Schwarze expressed the opinion that plaintiff could continue to work at regular duty without any restrictions. (Id.).

Plaintiff saw Dr. Schwarze on June 11, 2002. (Tr. 137). It was noted that plaintiff had received her knee brace and that it fit well. (Id.). Plaintiff reported that she had been compliant with her home exercise program, although Dr. Schwarze noted that plaintiff could not demonstrate her compliance. (Id.). Upon physical examination, Dr. Schwarze found that plaintiff's right knee was clinically aligned, with no swelling or effusion. (Id.). Dr. Schwarze found that plaintiff could continue to work on a regular duty capacity without any restrictions. (Id.). He instructed plaintiff on her home exercise program. (Id.).

Plaintiff saw Dr. Schwarze on July 9, 2002. (Tr. 134-35). Plaintiff reported that she had been wearing the knee brace on a regular basis and that she had been doing her home exercises. (Tr. 134). Plaintiff continued to report pain, which was worse with stairs and prolonged sitting.

---

[13]Darvocet is indicated for the relief of mild to moderate pain. See PDR at 3504.

[14]Fat. Stedman's at 28.

(Id.).  Upon physical examination, plaintiff was able to perform a straight leg raise, and no swelling was found.  (Id.).  Dr. Schwarze found that plaintiff's condition had plateaued and that her pain was not attributable to any discernible orthopedic pathology.  (Id.).  Dr. Schwarze noted that plaintiff's pain may persist due to the aggravating factor of her weight.  (Id.).  He recommended that plaintiff continue with her home exercise program and try over-the-counter anti-inflammatories.  (Tr. 135).  Dr. Schwarze stated that plaintiff could continue to work with no restrictions, although he recommended that she wear her knee brace while at work.  (Id.).  He expressed the opinion that plaintiff had reached maximal medical improvement and released her from his care.  (Id.).

Plaintiff presented to Jack C. Tippett, M.D., on April 9, 2003, for an orthopedic evaluation at the request of the Commissioner.  (Tr. 156-58).  Plaintiff's chief complaint was pain in her right knee.  (Tr. 156).  Plaintiff's weight was 480 pounds.  (Id.).  Upon physical examination, plaintiff was able to fully extend her right knee, although she complained of pain as it was extended.  (Tr. 157).  Dr. Tippett's impression was morbid obesity and degenerative joint disease[15] of the right knee.  (Id.).

On April 17, 2003, a state agency physician completed a Physical Residual Functional Capacity Assessment.  (Tr. 161-68).  The physician expressed the opinion that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push or pull an unlimited amount.  (Tr. 162).  The physician found that plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 163-65).

---

[15]Osteoarthritis.  Stedman's at 513.

- 13 -

Plaintiff presented to Dr. Smith on September 15, 2003, with complaints of right upper quadrant pain after undergoing a laparoscopic cholecystectomy[16] at Barnes. (Tr. 199). It was noted that plaintiff was taking Lexapro for depression. (Id.). Dr. Smith diagnosed plaintiff with upper abdominal pain, major affective disorder[17]-stable, and morbid obesity. (Id.). Plaintiff inquired about gastric bypass surgery and Dr. Smith referred her to a physician who performed the surgery. (Id.).

Plaintiff presented to Dr. Smith on September 29, 2003, with complaints of intermittent dizzy spells, bi-frontal headaches, and mildly elevated blood pressure. (Tr. 198). Dr. Smith's impression was probably hypertension, headaches with a history of sleep apnea, and morbid obesity. (Id.). Dr. Smith noted that plaintiff was interested in gastric bypass surgery but was unable to find a physician willing to perform the surgery. (Id.).

Plaintiff saw Michael J. Brischetto, M.D., of Pulmonary Care of Eastern Missouri, on October 31, 2003, for treatment of her sleep apnea. (Tr. 172). Dr. Brischetto prescribed a CPAP machine. (Id.). Plaintiff saw Dr. Brischetto for follow-up visits regarding her sleep apnea on December 12, 2003, February 6, 2004, and August 13, 2004. (Tr. 171).

Plaintiff saw Dr. Smith on November 17, 2003, for a follow-up of her hypertension and hypothyroidism.[18] (Tr. 196). Plaintiff complained of left knee pain, which was exacerbated with weight-bearing and activity. (Id.). Dr. Smith noted that plaintiff's knee was difficult to examine

---

[16]Surgical removal of the gallbladder. Stedman's at 337.

[17]A mental disorder characterized by a disturbance in mood. Stedman's at 525.

[18]Diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to weight gain, and sleepiness. Stedman's at 866.

due to her "extreme morbid obesity." (Id.). Dr. Smith's impression was hypertension-stable, hypothyroidism, and left knee discomfort. (Id.). He prescribed a trial of Darvocet. (Id.).

Plaintiff presented to Dr. Smith with complaints of intermittent abdominal pain on January 1, 2004. (Tr. 197). Dr. Smith noted that plaintiff was recently diagnosed with an abnormal mass and was being treated by a gynecologist. (Id.). Dr. Smith's impression was abdominal pain. (Id.).

Plaintiff presented to Dr. Smith on January 22, 2004, with complaints of a severe headache for twelve days, which appeared to be getting worse. (Tr. 196). Plaintiff also reported dizziness and seeing black spots. (Id.). It was noted that plaintiff had a history of migraines. (Id.). Plaintiff indicated that she had been using her CPAP machine regularly. (Id.). Plaintiff also reported chest pain two days prior, which may have been an anxiety attack. (Id.). Dr. Smith's assessment was headaches of uncertain etiology and chest pain. (Tr. 195). Dr. Smith scheduled a CT scan and EKG. (Id.). On January 26, 2004, Dr. Smith indicated that the CT scan was normal. (Id.). He continued plaintiff on Darvocet and recommended that she have the settings on her CPAP machine tested. (Id.).

Plaintiff saw Dr. Smith for a follow-up of her headaches on February 19, 2004. (Tr. 193). Plaintiff complained of daily right-sided headaches that radiate down into the right side of the neck and shoulder. (Id.). Dr. Smith's impression was persistent headache-possible chronic daily headache syndrome. (Id.).

Plaintiff presented to Dr. Smith on April 5, 2004, with complaints of continued headaches that caused her to go to the emergency room. (Tr. 192). Dr. Smith's assessment was headaches

of uncertain etiology, hypothyroidism, and abnormal elevation of the sedimentation (SED) rate.[19] (Tr. 192-93).  He referred plaintiff to a neurologist and continued her on Darvocet for pain. (Tr. 192).

Plaintiff saw Dr. Smith on June 14, 2004, with complaints of left lower extremity pain. (Tr. 191).  It was noted that plaintiff presented to the emergency room on June 9, 2004, for pain in the left lower extremity.  (Id.).  No deep vein thrombosis[20] was found.  (Id.).  Upon physical examination, plaintiff was unable to dorsiflex[21] or plantar[22] flex her left foot.  (Id.).  Dr. Smith's impression was possible herniated intervertebral disc.[23]  (Id.).  He ordered an x-ray and MRI of the lumbar spine.  (Id.).

On June 24, 2004, plaintiff continued to complain of left leg pain.  (Tr. 190).  Dr. Smith indicated that an MRI of the lumbosacral spine was within normal limits.  (Id.).  Dr. Smith's impression was peculiar left leg neuralgia,[24] hypertension, sleep apnea syndrome, and migraine

---

[19]The rate of settling of red blood cells in anticoagulated blood; increased rates are often associated with anemia or inflammatory states.  Stedman's at 1519.

[20]Clotting within a blood vessel which may cause infarction of tissues surrounded by the vessel.  Stedman's at 1831.

[21]Upward extension of the foot.  Stedman's at 537.

[22]Relating to the sole of the foot.  Stedman's at 1392.

[23]An intevertebral disk is a disk interposed between the bodies of adjacent vertebrae.  It is composed of an outer fibrous part that surrounds a central gelatinous mass.  Stedman's at 523.  A herniated intervertebral disk is a protrusion of a degenerated or fragmented intervertebral disk into the intervertebral foramen with potential compression of a nerve root.  Id.

[24]Pain of a severe, throbbing, or stabbing character in the course or distribution of a nerve. Stedman's at 1206.

headaches.  (Id.).  He prescribed Topamax[25] for plaintiff's migraines and pain.  (Id.).

Plaintiff saw Dr. Smith on August 5, 2004, with concerns that her pneumonia was not getting better despite antibiotics.  (Tr. 188).  Dr. Smith's impression was dyspnea[26] in a patient with morbid obesity and severe sleep apnea syndrome.  (Id.).  He noted that plaintiff may need to see a pulmonologist for an opinion on her sleep apnea syndrome.  (Id.).

Plaintiff presented to James J. Gibbons, M.D. for pain management services on September 10, 2004.  (Tr. 200-03).  Plaintiff's chief complaint was bilateral leg pain.  (Tr. 200).  She also complained of headaches and depression.  (Tr. 201).  Upon physical examination, plaintiff was able to bend to touch the floor, although lateral bending and rotation caused some slight left low back pain.  (Tr. 202).  She walked with a limp.  (Id.).  Dr. Gibbons stated that plaintiff was morbidly obese, weighing 470 pounds.  (Id.).  Dr. Gibbons' assessment was neuralgia/neuritis.[27] (Id.).  He recommended a neurological evaluation and the use of medication such as Topamax. (Id.).  Dr. Gibbons noted that the etiology of plaintiff's pain may be a stretch injury caused by her obesity, in which case weight loss would be the best treatment.  (Tr. 203).  Dr. Gibbons stated that he did not have anything else to offer plaintiff in terms of evaluation or treatment.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.     The claimant meets the nondisability requirements for a period of disability and

---

[25]Topamax is an antiepileptic drug indicated for the relief of seizures.  See PDR at 2501-03.

[26]Shortness of breath.  Stedman's at 556.

[27]Inflammation of a nerve.  Stedman's at 1207.

Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's right knee arthritis/degenerative joint disease, left leg neuralgia, sleep apnea syndrome, and morbid obesity are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant retains the residual functional capacity to perform sedentary exertional level work.

7. The claimant is unable to perform any of her past relevant work as a cook and retail store product stocker as described in the body of the decision (20 CFR §§ 404.1568 and 416.968) (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has a "limited education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has the residual functional capacity to perform the full range of sedentary exertional level work (20 CFR §§ 404.1567 and 416.967).

11. Based on an exertional capacity for sedentary exertional level work and the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 201.19.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 21-22).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on February 20, 2003, the claimant is not entitled to a period of disability and Disability

Insurance Benefits, under Sections 216(i) and 223, respectively, of the Social Security Act.

It is the further decision of the Administrative Law Judge that, based on the application filed on February 19, 2003, the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 22).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (i) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. <u>See</u> <u>id.</u> If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. <u>See</u> <u>id.</u> Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. <u>See</u> 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. <u>See</u> <u>id.</u> Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. <u>See</u> 20 C.F.R. §§ 404.1520a

(e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.      Plaintiff's Claims**

Plaintiff raises three claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in failing to consider plaintiff's sleep apnea, fatigue, depression, migraine headaches, tingling and numbness in hands, and obesity.  Plaintiff next argues that the ALJ erred in discrediting plaintiff's subjective complaints of pain and limitations.  Plaintiff also contends that the ALJ erred in failing to obtain vocational expert testimony.  The undersigned will discuss plaintiff's claims in turn.

**1.      Plaintiff's Impairments**

Plaintiff argues that the ALJ failed to consider her sleep apnea, fatigue, depression, migraine headaches, tingling and numbness in hands, and obesity.  Plaintiff contends that these impairments were severe and that in combination they made her totally disabled.  Defendant argues that the ALJ properly considered all of plaintiff's impairments.

As noted above, step two of the sequential evaluation requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Basic work activities include mental functions such as understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  See 20 C.F.R. § 404.1521(b)(3)-(6); 416.921 (b)(3)-(6).  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c) (2003).  The claimant bears the burden at step two to demonstrate a severe impairment that

significantly limits the ability to perform basic work activities, although this burden is not great. See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination thereof would have no more than a minimal effect on the claimant's ability to work. See Simmons v. Massanari, 264 F.3d 751, 755 (8th Cir. 2001).

The ALJ found that plaintiff's right knee arthritis/degenerative joint disease, left leg neuralgia, sleep apnea syndrome, and morbid obesity were severe impairments. (Tr. 18). Plaintiff testified that she experiences constant fatigue due to her sleep apnea.[28] (Tr. 27-28, 38). Thus, plaintiff's claim that the ALJ failed to consider her sleep apnea, obesity, and fatigue lacks merit.

With regard to plaintiff's alleged tingling and numbness in her hands, there is no evidence of such complaints in the medical record. As such, the ALJ did not err in failing to consider plaintiff's alleged tingling and numbness in her hands as a severe impairment.

The medical record does, however, contain extensive evidence of migraine headaches. Plaintiff first complained of migraines to Dr. Smith on June 20, 2000, prior to her alleged onset date. (Tr. 127). Plaintiff complained of intermittent headaches, which Dr. Smith described as muscle contraction headaches on September 29, 2003. (Tr. 198). On January 22, 2004, plaintiff presented to Dr. Smith with complaints of a severe headache lasting twelve days. (Tr. 196). Plaintiff complained of daily right-sided headaches that radiated down into the right side of the neck and shoulder on February 19, 2004. (Tr. 193). Plaintiff reported continued headaches that caused her to go to the emergency room on April 5, 2004. (Tr. 192). Dr. Smith prescribed Darvocet. (Id.). On June 24, 2004, Dr. Smith diagnosed plaintiff with migraine headaches and

---

[28]Chronic lethargy is a symptom of sleep apnea. See Stedman's at 111.

prescribed Topamax. (Tr. 190). Plaintiff testified at the hearing that she has been experiencing severe migraine headaches for four to five years, which cause sensitivity to light and nausea. (Tr. 40-41). Plaintiff stated that the migraines last between two hours and all day, and occur two to three times a month. (Tr. 41). Plaintiff also testified that she saw a neurologist, Dr. Temple, in April of 2004 for her migraines. (Tr. 40).

The ALJ did not find plaintiff's migraine headaches to be a severe impairment. In fact, the ALJ did not even discuss plaintiff's migraine headaches. The undersigned find that the ALJ's failure to consider plaintiff's migraine headaches as a severe impairment was error. The record supports the presence of migraine headaches since June of 2000, for which plaintiff received treatment including prescription pain medication and anti-seizure medication. As such, the ALJ was required to consider the migraine headaches as a severe impairment.

Plaintiff also argues that the ALJ erred in failing to consider her depression as a severe impairment. On September 15, 2003, Dr. Smith diagnosed plaintiff with major affective disorder, and noted that plaintiff was having a "good response to the Lexapro therapy for her depression." (Tr. 199). Plaintiff complained of depression on September 10, 2004, to pain management specialist Dr. Gibbons. (Tr. 201). Plaintiff was still taking Lexapro at the time of the hearing. (Tr. 43, 106). Plaintiff testified that her depression causes her to feel "down" once or twice a week, at which times she stays in bedroom all day and avoids people. (Id.). Plaintiff stated that she had not received any counseling or other treatment for her depression. (Id.).

The record supports the presence of a mental impairment. The undersigned finds that the ALJ's failure to consider plaintiff's mental impairment is erroneous. Four broad mental functional areas exist: activities of daily living, social functioning, concentration, persistence or pace, and

episodes of decompensation. See 20 C.F.R. §§ 404.1520a (c) (3); 20 C.F.R. § 416.920a (c) (3). In rating the first three functions, a scale is used, including "none, mild, moderate, marked, and extreme" limitations. See 20 C.F.R. §§ 404.1520a (c) (4); 416.920a (c) (4). In order for an impairment to be found "severe," the impairment must generally result in limitation rated above the "none" or "mild" levels. See 20 C.F.R. §§ 404.1520a (d) (1), 404.920a (d) (1). Thus, an impairment found to cause "none," or only "mild" limitations will not be found severe.

There is no medical evidence whatsoever to suggest whether plaintiff's mental impairments affect her ability to work. Rather, the medical evidence suggests that plaintiff has a mental impairment of some severity, of which the impact upon plaintiff's ability to work has not been determined. As such, the ALJ did not adequately develop the record regarding plaintiff's mental impairment.

An ALJ has a duty to fully develop the record, particularly where a claimant is not represented by counsel. See Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981). This inquiry is limited to whether the claimant was prejudiced or unfairly treated by the ALJ's development of the record. See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). A consultative examination may be ordered when "the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on [a claimant's] claim." 20 C.F.R. §§ 404.1519a (b), 416.919a (b). It has been held to be reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision. See Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001). However, an "ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1999)

(quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).

In sum, the undersigned finds that the ALJ erred in failing to consider plaintiff's migraine headaches and depression as severe impairments. The undersigned also finds that the ALJ did not fully develop the record regarding plaintiff's mental impairment. Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to fully determine the effects of plaintiff's migraine headaches and mental impairment on her ability to function in the workplace. The ALJ should obtain additional medical evidence addressing the effect of plaintiff's mental impairment on her ability to function in the workplace.

## 2.    **Credibility Analysis**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible. Defendant contends that the ALJ's credibility determination is supported by substantial evidence in the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the

consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. <u>Polaski</u>, 739 F.2d at 1322. <u>See also</u> <u>Burress</u>, 141 F.3d at 880.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is not supported by substantial evidence in the record as a whole. It appears that the ALJ in his opinion did not point to a single <u>Polaski</u> factor as militating against the credibility of plaintiff's complaints. He failed to discuss the duration, frequency, and intensity of plaintiff's pain; aggravating and precipitating factors; and dosage, effectiveness and side effects of plaintiff's medication. The ALJ did mention plaintiff's testimony regarding her daily activities, although he failed to explain how plaintiff's daily activities detract from her credibility. (Tr. 19).

Moreover, the credibility factors indicated by the ALJ are either not dispositive in themselves or are analyzed incorrectly. For instance, the ALJ first discusses the fact that the objective medical findings do not lend credibility to plaintiff's complaints of pain. (Tr. 19-20). While this is a factor the ALJ may consider, it may not be solely relied upon by an ALJ to discredit a plaintiff's subjective complaints. <u>See</u> <u>Curran-Kicksey v. Barnhart</u>, 315 F.3d 964, 968 (8th Cir. 2003). In this case, the ALJ appears to rely solely on the purported lack of medical evidence in discrediting plaintiff's subjective complaints. The ALJ stated that there were discrepancies between plaintiff's subjective complaints and the medical evidence. (Tr. 19). The only such discrepancy the ALJ cites, however, is the May 2002 treatment note of Dr. Schwarze indicating that plaintiff had no work restrictions. (Tr. 20, 140). Notably, Dr. Schwarze's

statement was made prior to plaintiff's December 31, 2002 onset of disability date, and pertained only to her knee impairment.

The ALJ also states that plaintiff did not follow her prescribed weight loss program. (Tr. 20). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003). The ALJ, however, does not cite to any particular instance of non-compliance with a weight loss program. In fact, the record contains several notes indicating that plaintiff attempted to find a doctor who would perform gastric bypass surgery. (Tr. 56, 199, 198).

In sum, the undersigned recognizes that each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). However, the administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). In this case, the ALJ has not given sufficiently good reasons for discounting plaintiff's subjective complaints of pain and limitations.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the Commissioner in order for the ALJ to more fully evaluate plaintiff's complaints under the standards set out in Polaski. In particular, the ALJ should discuss plaintiff's daily activities, duration, frequency, and intensity of the pain, aggravating and precipitating factors, dosage, effectiveness and side effects of plaintiff's medication, and plaintiff's functional restrictions.

**3.    Vocational Expert Testimony**

Plaintiff finally argues that the ALJ erred by using the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because the ALJ failed to properly consider plaintiff's numerous non-exertional impairments.  Plaintiff contends that the ALJ's use of the Medical-Vocational Guidelines, commonly known as the "Grids," to determine that plaintiff was capable of performing other work, was error.  Plaintiff argues that once a non-exertional impairment is shown to exist, vocational expert testimony is required.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy.  The Commissioner may rely on the Medical-Vocational Guidelines to show the availability of work in certain limited circumstances.  See Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999).  "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment."  Id. (quotation omitted).  Use of the guidelines is permissible only if the claimant's characteristics identically match those contained in grids and only if the claimant does not have non-exertional impairments.  See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are nonexertional, and who therefore cannot perform the full range of work contemplated within each table."  Id. at 26.  Accordingly, the Eighth Circuit

requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a nonexertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id. (alteration in original) (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)). "Thus, if a claimant's ability to perform the full range of work in a particular category is limited by a non-exertional impairment, the ALJ cannot rely exclusively on the grids to determine disability but must consider vocational expert testimony." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The undersigned finds that the ALJ committed error by not eliciting the testimony of a vocational expert. The ALJ acknowledged that plaintiff suffers from sleep apnea and morbid obesity, which are non-exertional impairments. (Tr. 18). In addition, the ALJ found that plaintiff suffers from arthritis/degenerative joint disease. (Id.). Plaintiff experiences significant pain due to these impairments. Pain has been found to be a non-exertional impairment. See Gray, 192 F.3d at 802. In addition, as discussed above, the record supports the presence of mental impairments, which are non-exertional in nature.

The ALJ's finding that plaintiff was able to perform other work existing in significant numbers in the national economy in spite of her non-exertional impairments thus "invaded the province of the vocational expert" and was improper. Foreman, 122 F.3d at 26 (quoting Sanders v. Sullivan, 983 F.2d 822, 824 (8th Cir. 1992)).

The undersigned has found that the ALJ failed to consider all of plaintiff's impairments and improperly assessed plaintiff's credibility. Accordingly, the undersigned recommends that the

decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to consider all of plaintiff's impairments, reassess plaintiff's credibility, and adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict her ability to perform jobs in the national economy.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation and further that the court not retain jurisdiction of this matter.

The parties are advised that they have eleven (11) days, until August 28, 2007, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this ___17th___ day of August, 2007.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE